# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

RAYMOND PAUL SWETT, JR.,

        Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

No. C10-3057-MWB

**REPORT AND RECOMMENDATION**

---

### *Introduction*

The plaintiff, Raymond Paul Swett, Jr., seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his applications for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") pursuant to Titles II and XVI of the Social Security Act. 42 U.S.C. §§ 405(g), 1383(c)(3). Swett contends that the administrative record ("AR") does not contain substantial evidence to support the Commissioner's decision that he is not disabled. For the reasons that follow, the undersigned recommends that the Commissioner's decision be **affirmed**.

### *Background*

Swett was born in 1962, has a twelfth-grade education, and previously worked as a dishwasher, stocker, and fast-food worker. AR 122, 128, 132. On June 16, 2008, Swett applied for DIB and SSI, alleging disability beginning on April 15, 2006, due to blindness in the left eye, diabetes, kidney problems, nerve damage, limited walking ability, learning disability, and heart problems. AR 9, 93-98, 122, 126. The Commissioner denied Swett's applications initially and again on reconsideration; consequently, Swett requested a hearing before an Administrative Law Judge ("ALJ"). AR 35-52. On June 3, 2010, ALJ John E.

Sandbothe held a hearing in which Swett and a vocational expert ("VE") testified. AR 20-34. On July 6, 2010, the ALJ issued a decision finding Swett not disabled since the alleged onset date of disability of April 15, 2006. AR 6-15. Swett sought review of this decision by the Appeals Council, which denied review on August 23, 2010. AR 1-5. The ALJ's decision thus became the final decision of the Commissioner. 20 C.F.R. §§ 404.981, 416.1481.

On October 12, 2010, Swett filed a complaint in this court seeking review of the ALJ's decision. This matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) for the filing of a report and recommended disposition of the case. The parties have briefed the issues, and the matter is now fully submitted.

### Summary of Medical Evidence

The court reviews below the medical record from Swett's alleged onset date of disability of April 15, 2006. *See Dipple v. Astrue*, 601 F.3d 833, 834 (8th Cir. 2010) (relevant period is from claimant's alleged disability onset date).

### A.     Bethesda Family Medicine

On April 28, 2006, Swett complained to Elizabeth Williams, M.D., of "intermittent episodes of left-sided chest wall pain, shoulder pain, abdominal pain as well as numbness, tingling and pain in his left arm and a shooting pain in his left leg. Also, over the last few weeks, he has been getting fatigued and [shortness of breath] with these episodes." AR 323. Swett was referred to St. Paul Cardiology to rule out a cardiac or vascular event. AR 323-24. Dr. Williams commented, "Perhaps some of this can be due to neuropathy secondary to diabetes but it does not seem typical in nature." AR 324.[1]

---

[1] Neuropathy denotes a functional disturbance or pathological change in the peripheral nervous system. *Dorland's Illustrated Medical Dictionary* 1287 (31st ed.2007).

On May 9, 2006, Swett related to Dr. Williams that, during the previous night, "he had an episode where he was hot and sweaty, nauseated, weak, having this chest pain which is different than his chest wall pain. He also notes that his diabetes has been kind of out of control for the past few weeks. . . . He has gone to some diabetic classes and some he has missed. He thinks it does help him." AR 321. Swett received an EKG referral for a diabetic eye examination. AR 322. On May 15, 2006, Swett underwent an eye examination at St. Paul Eye Clinic.

> Examination revealed background diabetic retinopathy and bilateral macular pigment changes. Visual acuity is poor in the left eye due to amblyopia. He has had bad vision in his left eye his entire life. He was patched as a child. He has congenital nystagmus and mild cataracts. [The examining physician] recommended yearly eye examinations for the diabetes. He does have background diabetic retinopathy.

AR 235.

On May 22, 2006. Swett again complained to Dr. Williams of chest pain and shortness of breath over the weekend, which "got a little better" on that Sunday. AR 317. Dr. Williams concluded, "[T]he chest discomfort was likely not myocardial ischemia"; an echocardiogram showed normal left ventricular systolic function "with a little LVH, no valvular lesions but possible LV relaxation abnormality." AR 317. Swett's diabetes medication was increased. AR 318.

On May 31, 2006, Swett complained to Aziza Shireen, M.D., of "chest pain mainly on the left side," stating that "pain is 7/10 on the pain scale which radiates to his left arm" and that the "pain is conflicting and comes and goes" and increases with exertion. Swett reported that Naproxen did not help to reduce the pain. Dr. Shireen concluded that the "[p]ain is not likely cardiac in origin at this moment." AR 315.

On June 9, 2006, Swett complained to Dr. Williams of tooth pain after an dental appointment. AR 313. Dr. Williams noted that Swett "recently has not been taking care of his diabetes much," which was not well controlled. AR 313. Swett had "not picked

up [his] prescription" of niacin "because has been so broke. He has not been able to work lately." AR 313.

On June 12, 2006, Swett underwent a coronary angiogram, which revealed mild, non-obstructive coronary artery disease, non-cardiac chest pain, a falsely abnormal CT coronary angiogram, and normal left ventricular systolic function and normal hemodynamics. AR 284.

On July 12, 2006, Swett expressed concern to Shannon Reidt, Pharm.D., about his blood sugar levels. AR 309. Dr. Reidt noted that "readings from the past two weeks have ranged between 300 and 400 with some readings in the 500's." Swett reported that he attended diabetes education and tried to make healthy dietary choices, but had not made any recent dietary changes that would explain his elevated blood sugar level. AR 309. He stated that he missed taking his medications about two to three times a week and his insulin about two times a week. AR 309. Swett also complained of "leg leg 'foot zingers' which just come on and off more in the last couple of weeks and only last for a few seconds. He is also noticing that he is having some numbness and stiffness in that leg which is worse than his right." AR 311. Dr. Williams noted that Swett "has been off of work for the last week with these complaints of his leg pain. Not sure if this a valid thing or not." AR 312.

On July 19, 2006, Swett obtained his diabetes medication and received training on using his flex pen. AR 308.

On August 24, 2006, Swett complained to Marc Baumgartner, M.D., of "some chronic fatigue related to his diabetes. Otherwise he states he has been unemployed[;] he was on medical leave from Wal-Mart," where he had been working as a truck loader. AR 135, 306. An angiogram "was otherwise negligible," and "no operative intervention was recommended at that time." AR 306. Dr. Baumgartner noted that Swett was able to work

the following Monday, and "provided him restrictions of heavy lifting and excessive activity at work. Otherwise, free to return to work." AR 306-07.

During a medication check on April 24, 2007, Swett asked to be treated only with insulin for diabetes because of side effects from his medications. AR 303-05.

On November 8, 2007, Swett complained to Adam Hoverman, M.D., of pain in his left shoulder and wrist that had been ongoing for months and was worse with movement. AR 301. He also complained of bilateral foot pain from weightbearing that worsened throughout the day, as well as nocturnal burning pain on the plantar aspect of his left foot not associated with weightbearing. AR 301. Although he was on insulin therapy, Swett's diabetes was poorly controlled. AR 301-02.

On November 26, 2007, Swett saw Dr. Hoverman and reported no complaints, although he acknowledged that he had occasionally forgotten to take his medications. AR 299. Swett reported to Dr. Hoverman that he "walk[ed] a lot" around the house, at the supermarket, and six blocks with his son. AR 299.

On March 5, 2008, Swett reported to Dr. Hoverman that, "in the last several weeks, he has had visual changes and intermittent blurred vision" and "has not made any of the dietary nor lifestyle nor exercise changes based on recommendations from [the] diabetic educator." Swett denied having chest pain, shortness of breath, abdominal or neck pain, or weakness or loss of sensation in any extremity. AR 296. Dr. Hoverman's treatment notes indicate that Swett was "not currently achieving the anticipated [diabetes] control hoped for with his diabetic education and therapeutic regimen. The patient states that this is hard to do so and that he is not currently interested in changing many of his lifestyle factors." AR 296.

On April 4, 2008, Swett reported to Dr. Hoverman of "some right heel pain" after walking five to six miles. AR 293. He also complained of intermittent, sharp left shoulder pain, which was alleviated when he slept with the shoulder elevated. AR 293. Dr.

Hoverman noted that, although Swett's hypertension was well controlled, his diabetes continued to be poorly controlled.  AR 294.

**B.    *Joseph Latella, D.O.***

On September 25, 2008, Joseph Latella, D.O., performed a consultative examination of Swett (AR 366-71) and noted as follows:

> [Swett] is a divorced forty six year old white, divorced male who is the father of three grown children and they live with their mother.  The last time he worked was in 2006 as a trailer loader for a trucking company.  He quit due to his diabetes and complications from it.
>
> He stated that he diabetes has affected his eyesight and he has nephritis of the kidney.  He does have a metabolic syndrome and is not controlled with his Lantus insulin 40 units 4 times daily along with Humulin insulin 3 times a day.  This is given SubQ and he is taking Metformin 1000 mg twice daily.  He stated that his sugars run over 300 mg/dl every day.  He is also taking Tricor and Crestor for his hyperlipidemia.  His blood pressure is under control with Lisinopril 10 mgs. daily.  He has been diagnosed with Type II diabetes for the past ten years and may need an insulin pump to control this disease.  He denies any history of allergies to food or medications and has never had any surgeries.
>
> He does not drive and has never had a driver's license.  He has been treated for strabismus as a child and does wear glasses.  He has lost partial eyesight in the left eye laterally.  His Snellen's chart showed without glasses left eye 20/200, the right eye 20/40 and with both eyes with glasses in place his eyesight was 20/20.  He does exhibit color blindness with red looking blue.  He has graduated high school and can read, write and understand the English language.  He can crawl, kneel and climb stairs.  He can transfer objects with either hand.  He takes care of his own finances.  He does not drink alcohol, abuse drugs or smoke.  He has just moved from Minnesota to the Fort Dodge area and is qualified for Medicaid.
>
> . . . .
>
> The range of motion chart is filled out and is relatively normal.  His gait is normal and he does not use any cane, crutch or walker.  He stated that he

was seen and examined by a physician in Fort Dodge, Iowa last week and he
does not know the physician's name or the results of the labs.

AR 370-71. Dr. Latella's diagnoses included (1) metabolic syndrome; (2) ventral abdominal hernia; (3) hyperlipidemia; (4) hypertension; and (5) unknown diabetic nephropathy. AR 371.

## C. State Agency Medical Consultants

On November 19, 2008, Laura Griffith, D.O., a state agency medical consultant, assessed Swett's physical residual functional capacity ("RFC"). AR 372-79. Dr. Griffith opined that Swett could (1) lift and/or carry 50 pounds occasionally and 25 pounds frequently; (2) stand and/or walk for a total of about six hours in an eight-hour workday; (3) sit for about six hours in an eight-hour workday; and (4) perform unlimited pushing and/or pulling with the upper and lower extremities. AR 373. Further, Swett could frequently climb, balance, stoop, kneel, crouch, and crawl. AR 374. Finally, Swett had no manipulative, visual, communicative, or environmental limitations other than avoiding concentrated exposure to hazards and extreme cold and heat because of his diabetic neuropathy. AR 375-76. Dr Griffith found Swett's allegations to be "partially credible. Poor compliance is noted with regard to his diabetic control. However, MER indicates he is able to walk 5-6 miles and is currently looking for employment," which contradicted Swett's report that his "walking is limited to 20 minutes." AR 377, 379. Dr. Griffith found Swett's medically determinable impairments of obesity and diabetic neuropathy to be severe. AR 379.

On April 20, 2009, Chrystalla Daly, D.O., another state agency medical consultant, expressed the same opinion about Swett's physical RFC, except that she concluded that Swett could only occasionally climb, balance, stoop, kneel, crouch, and crawl. AR 409-16. Dr. Daly noted Swett's reported ability to walk five to six miles and to stand to wash dishes for at least four hours. AR 411.

## D.    Wolfe Eye Clinic

On November 19, 2008, Swett underwent a eye examination at the Wolfe Eye Clinic in consultation for retinal disease.  AR 388-90.  Swett complained of blurry vision in both eyes that began two years earlier and of flashes that affected both near and far vision.  AR 388.  Although the onset was "constant," the condition was moderate and associated with reading.  AR 388.  Swett was ultimately diagnosed with severe, non-proliferative diabetic retinopathy with no diabetic macular edema; a history of amblyopia in the left eye; and mild cataracts.  AR 390.  Swett's vision remained "about the same" during a diabetic vision check three months later on February 26, 2009, but he did not complain of pain.  AR 391-93.

## E.    Iowa Heart Center

On February 19, 2009, Swett was examined at the Iowa Heart Center for his complaint of chest pain.  AR 403-05.

> [Swett has] had chest pain off and on for many months.  He has about 1-2 occasions per month that is usually burning pain, may occur at rest, it's more on the right side of his chest.  He can't identify any aggravating factors.  His pain may be present for only a minute or may be present for a couple of hours.  He has no symptoms with exertion.  He is not working right now but he says he walks every day and [is] able to do that without any chest pain or undue dyspnea.

AR 403.

On March 3, 2009, myocardial perfusion imaging of Swett at the Iowa Heart Center revealed normal myocardial perfusion imaging, with no infarction or ischemia noted.  AR 406-07.

## F.    Community Health Center of Fort Dodge

On July 10, 2009, Swett visited the Fort Dodge Community Health Center seeking a new prescription for his medications and also complaining of a rotator cuff injury in his right shoulder from slipping on a wet floor.  AR 424.  On March 26, 2010, Swett reported

that he walked five miles a day, did not test his blood sugar at home because of the cost, and had not been able to have shoulder surgery performed because of his high blood sugar. AR 425. Swett's medications were refilled. AR 425. Swett had no complaints in a follow-up visit on April 23, 2010. AR 427.

## *Hearing Testimony*

### *A.    Plaintiff's Testimony*

Swett stands five feet and eight inches tall and weighs 250 pounds. AR 23. At the time of the hearing, he had lost thirty pounds because of his diabetes. AR 23. Swett is single and lives with his 19-year-old son. AR 23. Swett does not have a driver's license because of his blurred vision where he "can't see half of the time on [his] left side." AR 24.

At the time of the hearing, he worked 20 to 25 hours per week as a dishwasher at Ford Dodge Community College. AR 24. As a dishwasher and fast-food worker he occasionally would have to lift up to fifty pounds. AR 32. Swett is a diabetic and injects insulin four times a day, which takes him 15 to 20 minutes to do. AR 24-25, 27. If his blood sugar level is still too high, he also takes Novolog as necessary to reduce his diabetes. AR 26-27. It takes Swett 15 minutes to check his blood sugar. AR 28.

Swett's diabetes causes him to feel fatigued; "sometimes it takes up to two days at a time to recuperate." AR 28. As a result of his fatigue, he naps "[a]t least four times a day." AR 28. He also suffers from loss of muscle, strength, and vision, and has nerve pain throughout his legs and arms. AR 28. Swett also suffers from a loss of sensation, and has numbness in his hands and feet from nerve damage. AR 29. According to Swett, "sometimes where I'm walking . . . I'll get into a point where my leg just feels like it goes into a limp mode and I start limping, loss of strength, very painful sharp pains in the bottom of my feet." AR 29. The ALJ noted that Swett's medical records indicate that he

never complained to a doctor about his hands and feet tingling, but Swett responded that the tingling began "[t]he moment that [he] developed diabetes." AR 31. Swett testified that he also suffers daily from blurry vision in both eyes, and is in pain on a daily basis. AR 28-30.

Swett's employer at the time of the hearing did not have a problem with his taking occasionally unscheduled breaks for insulin injections. AR 28-29. At times Swett would need to take unscheduled breaks because "[s]ometimes I just got to get up and go." AR 29.

**B.    VE's Testimony**

The VE testified that a hypothetical individual of Swett's age, education, and work experience with diabetes, obesity, and a restriction on work requiring fine visual detail who could lift 50 pounds occasionally and frequently could perform Swett's past work as a dishwasher, fast-food worker, and stocker as generally performed, AR 32. Such an individual, however, would not be competitively employable if that individual also had to take two or more unscheduled fifteen-minute breaks per day, could not stand for more than a total of two hours during a work day, and could not perform gross or fine manipulation. AR 32-33.

According to the VE, an individual with no limitations other than the need for two unscheduled fifteen-minute breaks could be competitively employed. AR 33. On the other hand, a work restriction of three or more unscheduled fifteen-minute breaks "would limit a person's employability." AR 34.

### Summary of ALJ's Decision

On July 6, 2010, the ALJ found that Swett (1) had not engaged in substantial gainful activity since the alleged onset date of disability of April 15, 2006; and (2) had an impairment or a combination of impairments considered to be "severe" on the basis of the

requirements in the Code of Federal Regulations; but (3) did not have an impairment or a combination of impairments meeting or equaling one of the impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1; and (4) was able to perform his past relevant work as a dishwasher, stocker, and fast-food worker. AR 11-15. The ALJ accordingly found that Swett was not disabled from April 15, 2006, through the date of the ALJ's decision. AR 15.

In so finding, the ALJ found that the plaintiff had the RFC to perform medium work and lift 50 pounds occasionally and 50 pounds frequently, but he could not "perform fine detail in vision." AR 12.

Regarding Swett's credibility, the ALJ found that his "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [his] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [ALJ's] residual functional capacity assessment." AR 14. The ALJ found that Swett "experiences some symptoms and limitations; however, the record does not fully support the severity of [his] allegations." AR 14. Swett "has received treatment for diabetes, yet the primary recommendation was for [him] to exhibit better self care and follow prescribed medication regimens. Multiple cardiac tests proved negative. [Swett] periodically received musculoskeletal pain care, but on an episodic basis only." AR 14. The ALJ noted Swett's "history of diabetes mellitus, with poor compliance with treatment. Treatment notes from March 2008 indicated [he] 'has not made any of the dietary nor lifestyle nor exercise changes based on recommendations from [the] diabetic educator.'" AR 13 (quoting AR 296). Further, the ALJ "fully incorporated" the effect of Swett's obesity into the ALJ's RFC assessment. AR 13.

*Disability Determinations and the Burden of Proof*

The Social Security Act defines a disability as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505, 416.905. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520, 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b), 416.921(b). These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing,

pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. *Id.* §§ 404.1521(b)(1)-(6), 416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141, 107 S. Ct. 2287, 2291 (1987). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's RFC to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1545(a)(4), 416.920(a)(4)(iv), 416.945(a)(4). "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical

history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to prove that there is other work that the claimant can do, given the claimant's RFC as determined at step four, age, education, and work experience. *See Bladow v. Apfel*, 205 F.3d 356, 358-59 n.5 (8th Cir. 2000). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find that the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At step five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

### The Substantial Evidence Standard

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards and whether the factual findings are supported by substantial evidence on the record as a whole. *Page*, 484 F.3d at 1042. This review is deferential;

the court "must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010); *see Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that supports the Commissioner's decision as well as the evidence that detracts from it." *Kluesner*, 607 F.3d at 536 (quoting *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008)). The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Sec'y of Health & Human Servs.*, 879 F.2d 441, 444 (8th Cir. 1989). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record de novo." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the [Commissioner's] denial of benefits." *Kluesner*, 607 F.3d at 536 (quoting *Finch*, 547 F.3d at 935). This is true even in cases

where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (quoting *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984); *see Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005) ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion.").

## *Discussion*

### A.    *Plaintiff's Credibility*

Swett maintains that the ALJ erred in discounting his credibility on the basis of his noncompliance with medical treatment and the lack of documented complaints regarding his peripheral neuropathy. Doc. No. 8 at 18-20. The Commissioner asserts that Swett's noncompliance with treatment was a good reason to discount his credibility and that the medical evidence fails to support Swett's claimed limitations from neuropathy. Doc. No. 9 at 6-9.

"The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001). Accordingly, the court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). In this regard, an ALJ may discount a claimant's subjective complaints if there are inconsistencies in the record as a whole. *Id.* When evaluating a claimant's subjective complaints, the ALJ must consider 1) the claimant's daily activities; 2) the duration, frequency and intensity of the pain; 3) precipitating and aggravating factors; 4) dosage, effectiveness and side effects of medication; and 5) functional restrictions. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th

Cir. 1984); *see* 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii), 416.929(c)(3)(i)-(vii) (codifying *Polaski* factors). Other factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints. *Wildman v. Astrue*, 596 F.3d 959, 968 (8th Cir. 2010). Thus, although an ALJ may not discount a claimant's subjective complaints solely because they are unsupported by objective medical evidence, *Halverson v. Astrue*, 600 F.3d 922, 931-32 (8th Cir. 2010), such evidence is one factor that the ALJ may consider. *Ford v. Astrue*, 518 F.3d 979, 982 (8th Cir. 2008); *see Jones v. Astrue*, 619 F.3d 963, 975 (8th Cir. 2010) (noting that an ALJ is entitled to make a factual determination that a claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary). Further, an ALJ need not explicitly discuss each *Polaski* factor; it is sufficient if the ALJ acknowledges and considers those factors before discounting a claimant's subjective complaints. *Heino v. Astrue*, 578 F.3d 873, 881 (8th Cir. 2009); *see Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001) ("If the ALJ discredits a claimant's credibility and gives a good reason for doing so, we will defer to its judgment even if every factor is not discussed in depth.").

In assessing Swett's credibility, the ALJ first acknowledged the above factors. AR 13-14 (citing 20 C.F.R. §§ 404.1529(c) and 416.929(c) and Social Security Ruling 96-7p). The ALJ then pointed to the lack of objective medical evidence in discounting Swett's subjective complaints. AR 13-14.

### 1. *Plaintiff's Noncompliance with Medical Treatment*

The ALJ acknowledged Swett's allegation that "he had sought appropriate treatment for his conditions, but his symptoms continued at a disabling level." AR 12. The ALJ noted Swett's "history of diabetes mellitus, with poor compliance with treatment. Treatment notes from March 2008 indicated [he] 'has not made any of the dietary nor lifestyle nor exercise changes based on recommendations from [the] diabetic educator.'" AR 13 (quoting AR 296). Swett asserts that the ALJ erroneously relied on his

noncompliance with prescribed treatment to find that he is not disabled, citing Social Security Ruling 82-59. Doc. No. 8 at 19. The Commissioner maintains that the ALJ considered Swett's noncompliance with treatment as a credibility factor, rather than as a basis to deny benefits. Doc. No. 9 at 8.

"Social Security Ruling 82-59 explains the circumstances in which the [Commissioner] may deny benefits to an otherwise disabled individual on the basis that the claimant has failed to follow [his] prescribed treatment." *Holley v. Massanari*, 253 F.3d 1088, 1092 (8th Cir. 2001).[2] A claimant "who would otherwise be found to be under a disability, but who fails without justifiable cause to follow treatment prescribed by a treating source which the [the Commissioner] determines can be expected to restore [his] ability to work, cannot by virtue of such 'failure' be found to be under a disability." Social Security Ruling 82-59, 1982 WL 31384, at *1. Justifiable reasons for a claimant's failure to follow prescribed treatment include the treatment's high degree of risk and the claimant's religious beliefs, extreme fear of surgery, and inability to afford the treatment and the unavailability of free community resources for the treatment. *Id.* at *3-4.

"Social Security Ruling 82-59 only applies to claimants who would otherwise be disabled within the meaning of the [Social Security] Act; it does not restrict the use of evidence of noncompliance for the disability hearing." *Holley*, 253 F.3d at 1092. In other words, "Social Security Ruling 82-59 does not restrict the use of evidence of noncompliance[;] it merely delineates the reasons that the Social Security Administration may deny benefits to an otherwise disabled person because they fail to comply with their doctor's prescribed treatment." *Id.* In *Holley*, the ALJ "analyzed the evidence of [the claimant's] noncompliance within the context of his analysis of [the claimant's] credibility.

---

[2] Social Security Rulings are "final opinions and orders and statements of policy and interpretations" that the Social Security Administration has adopted. 20 C.F.R. § 402.35(b)(1). Once published, these rulings are binding on all components of the Social Security Administration. *Heckler v. Edwards*, 465 U.S. 870, 873 n.3, 104 S. Ct. 1532, 1534 n.3 (1984); *Grebenick v. Chater*, 121 F.3d 1193, 1200 (8th Cir. 1997); 20 C.F.R. § 402.35(b)(1).

The ALJ never determined that [the claimant] was disabled and that compliance would restore his ability to work." *Id.* "By contrast, the ALJ determined that in spite of [the claimant's] noncompliance, he was not disabled. The ALJ used the evidence of [the claimant's] noncompliance solely to weigh the credibility of [his] subjective claims of pain. . . . Therefore, Social Security Ruling 82-59 does not apply to this case." *Id.*

Here, Swett's noncompliance with recommended or prescribed treatment was an appropriate reason for the ALJ to discount his credibility. "It is for the ALJ in the first instance to determine [the claimant's] motivation for failing to follow prescribed treatment or seek medical attention." *Johnson v. Bowen*, 866 F.2d 274, 275 (8th Cir. 1989). The ALJ noted Swett's "history of diabetes mellitus, with poor compliance with treatment. Treatment notes from March 2008 indicated [he] 'has not made any of the dietary nor lifestyle nor exercise changes based on recommendations from [the] diabetic educator.'" AR 13 (quoting AR 296). Swett asserts that "there may be an indication of [his] incapacity to follow medical advice but there is no demonstration of a lack of desire to do so." Doc. No. 8 at 19. In March 2008, however, Swett was "urged to strive for better compliance" because he had "not made any of the dietary nor lifestyle nor exercise changes based on recommendations from [the] diabetic educator," and was "not currently interested in changing many of his lifestyle factors" to achieve control of his diabetes. AR 296. As in *Holley*, Social Security Ruling 82-59 does not apply in this case because the ALJ did not determine that Swett was disabled and that compliance would restore his ability to work. Rather, the ALJ used evidence of Swett's noncompliance in weighing Swett's credibility. Because "[a] failure to follow a recommended course of treatment . . . weighs against a claimant's credibility," the ALJ appropriately considered Swett's noncompliance with treatment as a reason to discount his credibility. *Guilliams*, 393 F.3d at 802; *see also Ramirez v. Barnhart*, 292 F.3d 576, 582 (8th Cir. 2002).

## 2. *Plaintiff's Peripheral Neuropathy*

The ALJ found that Swett "alleged neuropathy in his extremities; however, the medical evidence does not document such complaints." AR 13. Swett maintains that "[t]he ALJ erred in not finding that there was peripheral neuropathy." Doc. No. 8 at 18. The ALJ did not discount Swett's diagnosis of neuropathy. Rather, the ALJ found Swett's allegations that his limitations from his neuropathy were disabling not to be credible.

Swett stated on a function report completed on March 15, 2009, he could only walk a quarter of a mile before needing to stop and rest for fifteen to thirty minutes. AR 203. He also stated on the report that he was "tired all the time" because his sleep was "constantly disrupted" from the neuropathic pain in his limbs. AR 199. Swett further testified at the administrative hearing in June 2010 that he suffered from loss of sensation or numbness in his hands and feet from nerve damage. AR 29. According to Swett, "sometimes where I'm walking . . . I'll get into a point where my leg just feels like it goes into a limp mode and I start limping, loss of strength, very painful sharp pains in the bottom of my feet." AR 29. On a questionnaire completed on March 15, 2009, however, Swett stated that his pain and fatigue did not limit his ability to use his arms and hands or to walk, stand, or sit. AR 194-95. He denied having weakness or loss of sensation in any extremity in March 2008. AR 296.

On July 8, 2008, Swett stated on a function report that he was able to clean his house, wash his clothes, cut his grass, and perform home repairs. AR 156. Furthermore, the record indicates that in February 2009 Swett reportedly walked every day. AR 403. He walked as much as five to six miles in April 2008. AR 13, 293. In November 2007 Swett reported that he walked "a lot" around the house, at the supermarket, and six blocks with his son. AR 299. Acts that are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility. *Brown v. Astrue*, 611 F.3d 941, 955 (8th Cir. 2010); *see also Medhaug v. Astrue*, 578 F.3d 805, 817 (8th Cir. 2009) ("[A]cts

such as cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking, are inconsistent with subjective complaints of disabling pain."). Further, at the time of the administrative hearing in June 2010, Swett was working 20 to 25 hours per week as a dishwasher. AR 24. "Seeking work and working at a job while applying for benefits, are activities inconsistent with complaints of disabling pain." *Dunahoo*, 241 F.3d at 1039; *see Medhaug*, 578 F.3d at 816 (8th Cir. 2009); *Goff*, 421 F.3d at 792 ("Working generally demonstrates an ability to perform a substantial gainful activity. Throughout [the claimant's] claimed period of disability, the ALJ noted, [the claimant] persistently worked as a part-time kitchen aide. [The claimant] was also able to vacuum, wash dishes, do laundry, cook, shop, drive, and walk. These inconsistencies between [the claimant's] subjective complaints and her activities diminish her credibility." (internal citation omitted)). The ALJ thus properly discounted Swett's subjective complaints of pain or numbness in his extremities on the basis of inconsistencies in the record as a whole. AR 13-14.

## B.    *ALJ's RFC Assessment/Hypothetical Questions to VE*

Swett contends that "[t]he hypothetical question asked of the vocational expert and ultimately relied upon by the ALJ in making his determination is based on a faulty finding concerning [his] residual functional capacity." Doc. No. 8 at 12. Swett maintains that, in determining his RFC, the ALJ erred in (1) failing to include his need for frequent breaks; (2) failing to include his peripheral neuropathy; (3) including a lifting restriction of 50 pounds occasionally and 50 pounds frequently; and (4) failing to incorporate the effects of his obesity. Doc. No. 8 at 12-18. According to the Commissioner, Swett's "argument about the hypothetical question is, in essence, an additional credibility argument, as he argues that the ALJ should have included more of his allegations, such as his need to take lengthy unscheduled breaks during the workday, into the RFC." Doc. No. 9 at 9.

"In order for an ALJ to rely on a vocational expert's opinion, the posed hypothetical must accurately describe a claimant's impairments." *Morse v. Shalala*, 32 F.3d 1228, 1230 (8th Cir. 1994) (per curiam). "The proper question for a court in reviewing such a finding by an ALJ is whether the information given to the vocational expert in the hypothetical was supported by substantial evidence in the record as a whole." *Id.* "[A] hypothetical question posed to a VE need not include allegations that the ALJ found not credible." *Heino*, 578 F.3d at 882. As discussed further below, the hypothetical questions posed to the VE were supported by substantial evidence in the record as a whole.

### 1.    *Plaintiff's Peripheral Neuropathy and Need for Breaks*

As noted above, because of inconsistencies in the record, including Swett's reported ability to walk long distances, the ALJ found that Swett's alleged limitations from his peripheral neuropathy were not credible. Accordingly, because a hypothetical question posed to a VE need only include those impairments and limitations found credible by the ALJ, the ALJ was not required to pose these alleged limitations from Swett's neuropathy in his hypothetical question to the VE. *Dukes v. Barnhart*, 436 F.3d 923, 928 (8th Cir. 2006).

Swett also contends that the ALJ failed to incorporate in the RFC assessment his need for breaks during the work day. He testified in June 2010 that his diabetes causes him fatigue, and, as a result, he naps four times a day. AR 28. The VE testified that a need to take three or more unscheduled fifteen-minute breaks at work "would limit a person's employability." AR 33-34. Swett's activities that belie his allegations of disabling neuropathic pain, such as his extensive walking and his self-reported household activity in 2008, also support the ALJ's finding that Swett's claim of disabling fatigue was not credible. Furthermore, as noted previously, Swett reported in March 2009 that his pain and fatigue did not limit his ability to use his arms and hands or to walk, stand, or sit. For these reasons, substantial evidence in the record as a whole supports finding Swett's

allegations of disabling fatigue not credible.  The ALJ thus was not required to incorporate a need for breaks in the RFC assessment.  *See Owen v. Astrue*, 551 F.3d 792, 802 (8th Cir. 2008) (holding that ALJ did not err in omitting claimant's drowsiness from RFC finding because no evidence in record showed drowsiness restricted ability to work); *Tellez v. Barnhart*, 403 F.3d 953, 957 (8th Cir. 2005) (ALJ's determination regarding claimant's RFC "was influenced by his determination that her allegations were 'less than fully credible,' and we give the ALJ deference in that determination").

### 2. *Plaintiff's Lifting Restriction*

In assessing Swett's RFC, the ALJ found that he "could lift fifty pounds occasionally and fifty pounds frequently."  AR 12.  Contrary to Swett's assertion, substantial evidence in the medical record supports the ALJ's assessment that Swett was not precluded from performing medium work, which is defined as work involving "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."  20 C.F.R. §§ 404.1567(c), 416.967(c).  In August 2006, Swett's physician noted that he was "free to return to work" as a truck loader as long as he did not perform "heavy lifting" or "excessive activity."  AR 306-07; *see* 20 C.F.R. §§ 404.1567(d), 416.967(d) (defining heavy work as involving "lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds").  Further, Swett testified that he occasionally lifted up to fifty pounds as a dishwasher and fast-food worker.  AR 32.  State agency medical consultants in November 2008 and April 2009 opined that Swett could lift and/or carry "50 pounds occasionally" and "25 pounds frequently" (AR 373, 410), and the ALJ found that their "opinions are internally consistent and consistent with the evidence as a whole" (AR 14).  *See Hacker v. Barnhart*, 459 F.3d 934, 939 (8th Cir. 2006) ("The regulations specifically provide that the opinions of non-treating physicians may be considered."); 20 C.F.R. §§ 404.1527(f)(2)(i), 416.927(f)(2)(i) ("State agency medical and psychological consultants and other program physicians, psychologists,

and other medical specialists are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation. Therefore, administrative law judges must consider findings and other opinions of State agency medical and psychological consultants . . . as opinion evidence, except for the ultimate determination about whether [the claimant is] disabled."). Even if the ALJ erred in finding that Swett was capable of lifting "fifty pounds frequently," Swett does not demonstrate how a change in this regard would have changed the VE's testimony that Swett could return to his past medium-level work as a dishwasher (AR 32, 231), which means that any such error was harmless. *See Shinseki v. Sanders*, 556 U.S. 396, ___, 129 S. Ct. 1696, 1705-06 (2009) (burden is on party attacking agency's determination to show that prejudice resulted from error); *Tommasetti v. Astrue*, 533 F.3d 1035, 1042-43 (9th Cir. 2008) (error is harmless if inconsequential to ultimate nondisability determination). The ALJ thus did not err in restricting Swett's RFC to medium work rather than to heavy work.

### 3. *Plaintiff's Obesity*

Swett asserts that "[h]is obesity has some effect [on his RFC] – for instance it is probably the reason that [he] has Type II diabetes." Doc. No. 8 at 18. He thus contends that the ALJ erred in failing to include his obesity in assessing his RFC. In acknowledging Swett's obesity, the ALJ found as follows:

> The undersigned has given consideration to Social Security Ruling 02-1p, which instructs adjudicators to consider the effects of obesity not only under the listings, but also when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity. When obesity is identified as a medically determinable impairment, consideration will be given to any functional limitations resulting from the obesity in the residual functional capacity assessment in addition to any limitations resulting from any other physical or mental impairment identified. The effect of the claimant's obesity has been fully incorporated into the limitations detailed in the [ALJ's] residual functional capacity . . . .

AR 13; *see also* Social Security Ruling 02-1p.

Despite the ALJ's finding, Swett maintains that "[f]ailure to incorporate the effects of obesity into the hypothetical question fails to 'precisely set out all of the claimant's impairments.'" Doc. No. 8 at 18 (quoting *Morrison v. Apfel*, 146 F.3d 625, 628 (8th Cir. 1998)). In *Morrison*, however, the court held that the ALJ erred in failing to mention obesity in the hypothetical questions posed to the VE because the claimant's treating physician had identified the claimant's obesity as his "biggest problem" and had noted that the claimant had been fighting his weight problem for years. 146 F.3d at 628. The court thus found that, given the claimant's history with weight problems and the identification of obesity as a major problem by the claimant's doctor, "obesity may have been a legally relevant factor that the [vocational] expert could have used in determining whether other work was available for [the claimant]." *Id.* at 628-29. In this case, Swett points to no evidence of his treating sources ever opining that his obesity was as significant as the claimant's in *Morrison*.

Swett's "failure to testify at [his] hearing before the ALJ about any work-related limitations caused by [his] obesity further undermines [his] claim." *McNamara v. Astrue*, 590 F.3d 607, 611 (8th Cir. 2010) (citing *Anderson v. Barnhart*, 344 F.3d 809, 814 (8th Cir. 2003)). In *McNamara*, the court concluded that, given that neither the medical records nor the claimant's testimony demonstrated that her obesity resulted in additional work-related limitations, it was not reversible error for the ALJ's opinion to omit specific discussion of obesity. *Id.* at 612 (citing *Forte v. Barnhart*, 377 F.3d 892, 896 (8th Cir. 2004)). Like the claimant in *McNamara*, rather than offer evidence about how his obesity affected his ability to work, Swett testified that he had lost thirty pounds (AR 23). *See id.* at 611-12 ("Rather than offer evidence about how her obesity affected her ability to work, [the claimant] indicated that she had lost approximately twenty pounds in the five months between her examination by [her examining physician] and her hearing."); *see also Robson*

*v. Astrue*, 526 F.3d 389, 392-93 (8th Cir. 2008) (concluding that ALJ did not err in excluding claimant's obesity from hypothetical posed to VE because, although claimant claimed that her obesity exacerbated her existing medical infirmities, she did not explain how including her obesity would change question to VE). Further, on Swett's forms submitted as part of his applications for benefits, he did not claim his obesity was disabling. AR 126-27, 173, 210, 213; *see McNamara*, 590 F.3d at 611 (claimant's failure to identify in function report any physical limitations caused by obesity supported ALJ's rejection of claim that obesity was significant work-related limitation). The ALJ accordingly did not err in excluding Swett's obesity from the ALJ's RFC assessment.

### *Recommendation*

For the reasons discussed above, the court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards. Accordingly, IT IS RESPECTFULLY RECOMMENDED that the Commissioner's decision be **affirmed** and judgment be entered in favor of the Commissioner and against Swett.

Objections to the Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. 72. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**IT IS SO ORDERED.**

**DATED** this 31st day of August, 2011.

_____
PAUL A. ZOSS
CHIEF MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT