**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

RAYMOND PAUL SWETT, JR.,

              Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

              Defendant.

No. C 10-3057-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING
MAGISTRATE JUDGE'S REPORT
AND RECOMMENDATION**

---

**TABLE OF CONTENTS**

I. **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   A. *Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   B. *Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
      1. *Summary of medical evidence* . . . . . . . . . . . . . . . . . . 5
      2. *Hearing testimony* . . . . . . . . . . . . . . . . . . . . . . . . . 12
      3. *Summary of the ALJ's decision* . . . . . . . . . . . . . . . . . 14

II. **ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
   A. *Standard Of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
   B. *Swett's Objections* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
      1. *The ALJ's credibility determination* . . . . . . . . . . . . . . 21
         a. *Compliance with treatment* . . . . . . . . . . . . . . 22
         b. *Evidence of peripheral neuropathy* . . . . . . . . . . . 24
      2. *Residual functional capacity assessment and hypothetical
         questions* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
         a. *Peripheral neuropathy and need for breaks* . . . . . . . 32
         b. *Lifting restriction* . . . . . . . . . . . . . . . . . . . . 35

III. **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

# I.  INTRODUCTION

## A.  Procedural Background

This case is before me pursuant to a Report and Recommendation (docket no. 12) from Chief United States Magistrate Judge Paul Zoss, regarding plaintiff Raymond Swett's claims for disability insurance benefits (DIB) and supplemental security income benefits (SSI), pursuant to Titles II and XVI of the Social Security Act.

I quote from Judge Zoss's Report And Recommendation to introduce the procedural history of this case:

> On June 16, 2008, Swett applied for DIB and SSI, alleging disability beginning on April 15, 2006, due to blindness in the left eye, diabetes, kidney problems, nerve damage, limited walking ability, learning disability, and heart problems. AR 9, 93-98, 122, 126. The Commissioner denied Swett's applications initially and again on reconsideration; consequently, Swett requested a hearing before an Administrative Law Judge ("ALJ"). AR 35-52. On June 3, 2010, ALJ John E. Sandbothe held a hearing in which Swett and a vocational expert ("VE") testified. AR 20-34. On July 6, 2010, the ALJ issued a decision finding Swett not disabled since the alleged onset date of disability of April 15, 2006. AR 6-15. Swett sought review of this decision by the Appeals Council, which denied review on August 23, 2010. AR 1-5. The ALJ's decision thus became the final decision of the Commissioner. 20 C.F.R. §§ 404.981, 416.1481.

(docket no. 12, pp. 1-2.)

On October 12, 2010, Swett filed a complaint in this court seeking review of the ALJ's decision (docket no. 1).  The case was referred to Judge Zoss, pursuant to 28 U.S.C. § 636(b)(1)(B), for the filing of a report and recommended disposition of the case. On January 16, 2011, Swett filed his brief in support of benefits (docket no. 8).  First,

Swett argued that the ALJ's hypothetical questions to the vocational expert were not based on substantial evidence, as the hypothetical questions ignored the limiting effects of Swett's diabetes mellitus and obesity and were based on a lifting restriction that was inconsistent with the recommendation of Swett's doctors. Second, Swett contended that the ALJ erred in assessing Swett's credibility on two grounds. As to the first ground, Swett asserted that the ALJ erroneously discredited Swett's subjective complaints on the basis of Swett's alleged noncompliance with prescribed treatment. Swett contended that, while a claimant's lack of desire to comply with prescribed treatment may reflect adversely on credibility, no evidence exists here to suggest that Swett lacked desire to comply with treatment. Rather, Swett followed medical advice, but his diabetes remained out of control, despite his efforts. Moreover, Swett argued, on the basis of Social Security Rule 82-59, that the Commissioner may not deny benefits on the basis of noncompliance with prescribed treatment if the claimant has a justifiable reason for failing to follow treatment. Swett maintained that the ALJ failed to consider whether Swett had good reason for failing to comply with treatment. As to the second ground, Swett argued that the ALJ erred in discounting Swett's credibility by finding that Swett had not voiced concerns to his doctors about peripheral neuropathy. Swett maintained that his medical records documented his complaints about peripheral neuropathy.

On March 16, 2011, the Commissioner responded with his brief in resistance (docket no. 9). The Commissioner first argued that the ALJ's hypothetical questions were based on substantial evidence, as the ALJ formulated his hypothetical questions based on his proper determination of Swett's residual functional capacity. The Commissioner argued that the ALJ, in determining Swett's residual functional capacity, appropriately discounted Swett's reported limitations caused by his diabetes and obesity, based on the ALJ's finding that Swett was not entirely credible. Second, the Commissioner argued that

the ALJ, in determining Swett's credibility, appropriately considered Swett's noncompliance with medical treatment, as the record showed that Swett did not take medication as prescribed, keep appointments, and was not interested in changing his lifestyle. Moreover, the Commissioner maintained that Swett incorrectly understood Social Security Rule 82-59 to apply to credibility determinations. Rather, the Commissioner contended that while Rule 82-59 provides guidelines for the denial of benefits to an otherwise disabled individual on the basis of noncompliance, Rule 82-59 does nothing to restrict the ALJ's use of noncompliance in determining a claimant's credibility. Furthermore, the Commissioner argued that the ALJ properly discounted Swett's credibility, based on the inconsistencies between Swett's hearing testimony regarding his peripheral neuropathy and the medical records.

Judge Zoss issued a Report And Recommendation on August 31, 2011 (docket no. 12). Judge Zoss determined that the ALJ's decision was supported by substantial evidence in the record as a whole, and therefore recommended that the ALJ's decision denying benefits be affirmed. Specifically, Judge Zoss found that the ALJ properly discounted Swett's credibility, finding that the ALJ appropriately considered Swett's failure to follow prescribed treatment and that the record was inconsistent with Swett's testimony regarding the limitations caused by his peripheral neuropathy. Next, Judge Zoss found that the ALJ properly formulated his hypothetical questions to the vocational expert, as hypothetical questions need only include impairments and limitations that the ALJ finds credible.

On September 13, 2011, Swett filed a timely objection (docket no. 13) to Judge Judge Zoss's Report And Recommendation. The Commissioner filed his response to Swett's objection on September 23, 2011 (docket no. 15), in which he addresses Swett's arguments by incorporating the arguments made in his initial brief. The Commissioner

urges me to adopt the Report And Recommendation and affirm the ALJ's finding that Swett is not disabled.

### B. Factual Background

In his Report And Recommendation, Judge Zoss made the following findings of fact:

### 1. Summary of medical evidence

#### A. Bethesda Family Medicine

On April 28, 2006, Swett complained to Elizabeth Williams, M.D., of "intermittent episodes of left-sided chest wall pain, shoulder pain, abdominal pain as well as numbness, tingling and pain in his left arm and a shooting pain in his left leg. Also, over the last few weeks, he has been getting fatigued and [shortness of breath] with these episodes." AR 323. Swett was referred to St. Paul Cardiology to rule out a cardiac or vascular event. AR 323-24. Dr. Williams commented, "Perhaps some of this can be due to neuropathy secondary to diabetes but it does not seem typical in nature." AR 324.[1]

On May 9, 2006, Swett related to Dr. Williams that, during the previous night, "he had an episode where he was hot and sweaty, nauseated, weak, having this chest pain which is different than his chest wall pain. He also notes that his diabetes has been kind of out of control for the past few weeks. . . . He has gone to some diabetic classes and some he has missed. He thinks it does help him." AR 321. Swett received an EKG referral for a diabetic eye examination. AR 322. On May 15, 2006, Swett underwent an eye examination at St. Paul Eye Clinic.

---

[1] Neuropathy denotes a functional disturbance or pathological change in the peripheral nervous system. *Dorland's Illustrated Medical Dictionary* 1287 (31st ed. 2007).

Examination revealed background diabetic retinopathy and bilateral macular pigment changes. Visual acuity is poor in the left eye due to amblyopia. He has had bad vision in his left eye his entire life. He was patched as a child. He has congenital nystagmus and mild cataracts. [The examining physician] recommended yearly eye examinations for the diabetes. He does have background diabetic retinopathy.

AR 235.

On May 22, 2006. Swett again complained to Dr. Williams of chest pain and shortness of breath over the weekend, which "got a little better" on that Sunday. AR 317. Dr. Williams concluded, "[T]he chest discomfort was likely not myocardial ischemia"; an echocardiogram showed normal left ventricular systolic function "with a little LVH, no valvular lesions but possible LV relaxation abnormality." AR 317. Swett's diabetes medication was increased. AR 318.

On May 31, 2006, Swett complained to Aziza Shireen, M.D., of "chest pain mainly on the left side," stating that "pain is 7/10 on the pain scale which radiates to his left arm" and that the "pain is conflicting and comes and goes" and increases with exertion. Swett reported that Naproxen did not help to reduce the pain. Dr. Shireen concluded that the "[p]ain is not likely cardiac in origin at this moment." AR 315.

On June 9, 2006, Swett complained to Dr. Williams of tooth pain after an dental appointment. AR 313. Dr. Williams noted that Swett "recently has not been taking care of his diabetes much," which was not well controlled. AR 313. Swett had "not picked up [his] prescription" of niacin "because has been so broke. He has not been able to work lately." AR 313.

On June 12, 2006, Swett underwent a coronary angiogram, which revealed mild, non-obstructive coronary artery disease, non-cardiac chest pain, a falsely abnormal CT

6

coronary angiogram, and normal left ventricular systolic function and normal hemodynamics. AR 284.

On July 12, 2006, Swett expressed concern to Shannon Reidt, Pharm.D., about his blood sugar levels. AR 309. Dr. Reidt noted that "readings from the past two weeks have ranged between 300 and 400 with some readings in the 500's." Swett reported that he attended diabetes education and tried to make healthy dietary choices, but had not made any recent dietary changes that would explain his elevated blood sugar level. AR 309. He stated that he missed taking his medications about two to three times a week and his insulin about two times a week. AR 309. Swett also complained of "leg leg 'foot zingers' which just come on and off more in the last couple of weeks and only last for a few seconds. He is also noticing that he is having some numbness and stiffness in that leg which is worse than his right." AR 311. Dr. Williams noted that Swett "has been off of work for the last week with these complaints of his leg pain. Not sure if this a valid thing or not." AR 312.

On July 19, 2006, Swett obtained his diabetes medication and received training on using his flex pen. AR 308.

On August 24, 2006, Swett complained to Marc Baumgartner, M.D., of "some chronic fatigue related to his diabetes. Otherwise he states he has been unemployed[;] he was on medical leave from Wal-Mart," where he had been working as a truck loader. AR 135, 306. An angiogram "was otherwise negligible," and "no operative intervention was recommended at that time." AR 306. Dr. Baumgartner noted that Swett was able to work the following Monday, and "provided him restrictions of heavy lifting and excessive activity at work. Otherwise, free to return to work." AR 306-07.

During a medication check on April 24, 2007, Swett asked to be treated only with insulin for diabetes because of side effects from his medications. AR 303-05.

On November 8, 2007, Swett complained to Adam Hoverman, M.D., of pain in his left shoulder and wrist that had been ongoing for months and was worse with movement. AR 301.  He also complained of bilateral foot pain from weightbearing that worsened throughout the day, as well as nocturnal burning pain on the plantar aspect of his left foot not associated with weightbearing.  AR 301.  Although he was on insulin therapy, Swett's diabetes was poorly controlled.  AR 301-02.

On November 26, 2007, Swett saw Dr. Hoverman and reported no complaints, although he acknowledged that he had occasionally forgotten to take his medications.  AR 299.  Swett reported to Dr. Hoverman that he "walk[ed] a lot" around the house, at the supermarket, and six blocks with his son.  AR 299.

On March 5, 2008, Swett reported to Dr. Hoverman that, "in the last several weeks, he has had visual changes and intermittent blurred vision" and "has not made any of the dietary nor lifestyle nor exercise changes based on recommendations from [the] diabetic educator."  Swett denied having chest pain, shortness of breath, abdominal or neck pain, or weakness or loss of sensation in any extremity.  AR 296.  Dr. Hoverman's treatment notes indicate that Swett was "not currently achieving the anticipated [diabetes] control hoped for with his diabetic education and therapeutic regimen. The patient states that this is hard to do so and that he is not currently interested in changing many of his lifestyle factors." AR 296.

On April 4, 2008, Swett reported to Dr. Hoverman of "some right heel pain" after walking five to six miles.  AR 293.  He also complained of intermittent, sharp left shoulder pain, which was alleviated when he slept with the shoulder elevated.  AR 293. Dr. Hoverman noted that, although Swett's hypertension was well controlled, his diabetes continued to be poorly controlled.  AR 294.

8

**B.    *Joseph Latella, D.O.***

On September 25, 2008, Joseph Latella, D.O., performed a consultative examination of Swett (AR 366-71) and noted as follows:

> [Swett] is a divorced forty six year old white, divorced male who is the father of three grown children and they live with their mother. The last time he worked was in 2006 as a trailer loader for a trucking company. He quit due to his diabetes and complications from it.
>
> He stated that he diabetes has affected his eyesight and he has nephritis of the kidney. He does have a metabolic syndrome and is not controlled with his Lantus insulin 40 units 4 times daily along with Humulin insulin 3 times a day. This is given SubQ and he is taking Metformin 1000 mg twice daily. He stated that his sugars run over 300 mg/dl every day. He is also taking Tricor and Crestor for his hyperlipidemia. His blood pressure is under control with Lisinopril 10 mgs. daily. He has been diagnosed with Type II diabetes for the past ten years and may need an insulin pump to control this disease. He denies any history of allergies to food or medications and has never had any surgeries.
>
> He does not drive and has never had a driver's license. He has been treated for strabismus as a child and does wear glasses. He has lost partial eyesight in the left eye laterally. His Snellen's chart showed without glasses left eye 20/200, the right eye 20/40 and with both eyes with glasses in place his eyesight was 20/20. He does exhibit color blindness with red looking blue. He has graduated high school and can read, write and

9

> understand the English language.  He can crawl,
> kneel and climb stairs.  He can transfer objects
> with either hand.  He takes care of his own
> finances.  He does not drink alcohol, abuse
> drugs or smoke.  He has just moved from
> Minnesota to the Fort Dodge area and is
> qualified for Medicaid.
> . . . .
> The range of motion chart is filled out and is
> relatively normal.  His gait is normal and he
> does not use any cane, crutch or walker.  He
> stated that he was seen and examined by a
> physician in Fort Dodge, Iowa last week and he
> does not know the physician's name or the
> results of the labs.

AR 370-71.  Dr. Latella's diagnoses included (1) metabolic
syndrome; (2) ventral abdominal hernia; (3) hyperlipidemia;
(4) hypertension; and (5) unknown diabetic nephropathy.  AR
371.

## C.   *State Agency Medical Consultants*

On November 19, 2008, Laura Griffith, D.O., a state
agency medical consultant,  assessed Swett's physical residual
functional capacity ("RFC").  AR 372-79.  Dr. Griffith opined
that Swett could (1) lift and/or carry 50 pounds occasionally
and 25 pounds frequently; (2) stand and/or walk for a total of
about six hours in an eight-hour workday; (3) sit for about six
hours in an eight-hour workday; and (4) perform unlimited
pushing and/or pulling with the upper and lower extremities.
AR 373.   Further, Swett could frequently climb, balance,
stoop, kneel, crouch, and crawl.  AR 374.  Finally, Swett had
no manipulative, visual, communicative, or environmental
limitations other than avoiding concentrated exposure to
hazards and extreme cold and heat because of his diabetic
neuropathy.  AR 375-76.  Dr Griffith found Swett's allegations
to be "partially credible.  Poor compliance is noted with
regard to his diabetic control.  However, MER indicates he is
able  to  walk  5-6  miles  and  is  currently  looking  for

employment," which contradicted Swett's report that his "walking is limited to 20 minutes." AR 377, 379. Dr. Griffith found Swett's medically determinable impairments of obesity and diabetic neuropathy to be severe. AR 379.

On April 20, 2009, Chrystalla Daly, D.O., another state agency medical consultant, expressed the same opinion about Swett's physical RFC, except that she concluded that Swett could only occasionally climb, balance, stoop, kneel, crouch, and crawl. AR 409-16. Dr. Daly noted Swett's reported ability to walk five to six miles and to stand to wash dishes for at least four hours. AR 411.

### D.   Wolfe Eye Clinic

On November 19, 2008, Swett underwent a eye examination at the Wolfe Eye Clinic in consultation for retinal disease. AR 388-90. Swett complained of blurry vision in both eyes that began two years earlier and of flashes that affected both near and far vision. AR 388. Although the onset was "constant," the condition was moderate and associated with reading. AR 388. Swett was ultimately diagnosed with severe, non-proliferative diabetic retinopathy with no diabetic macular edema; a history of amblyopia in the left eye; and mild cataracts. AR 390. Swett's vision remained "about the same" during a diabetic vision check three months later on February 26, 2009, but he did not complain of pain. AR 391-93.

### E.   Iowa Heart Center

On February 19, 2009, Swett was examined at the Iowa Heart Center for his complaint of chest pain. AR 403-05.

> [Swett has] had chest pain off and on for many
> months. He has about 1-2 occasions per month
> that is usually burning pain, may occur at rest,
> it's more on the right side of his chest. He can't
> identify any aggravating factors. His pain may
> be present for only a minute or may be present
> for a couple of hours. He has no symptoms with
> exertion. He is not working right now but he

11

> says he walks every day and [is] able to do that
> without any chest pain or undue dyspnea.

AR 403.

On March 3, 2009, myocardial perfusion imaging of Swett at the Iowa Heart Center revealed normal myocardial perfusion imaging, with no infarction or ischemia noted.  AR 406-07.

### F.  *Community Health Center of Fort Dodge*

On July 10, 2009, Swett visited the Fort Dodge Community Health Center seeking a new prescription for his medications and also complaining of a rotator cuff injury in his right shoulder from slipping on a wet floor.  AR 424.  On March 26, 2010, Swett reported that he walked five miles a day, did not test his blood sugar at home because of the cost, and had not been able to have shoulder surgery performed because of his high blood sugar.  AR 425.  Swett's medications were refilled.  AR 425.  Swett had no complaints in a follow-up visit on April 23, 2010.  AR 427.

### 2.  *Hearing testimony*

#### A.  *Plaintiff's Testimony*

Swett stands five feet and eight inches tall and weighs 250 pounds.  AR 23.  At the time of the hearing, he had lost thirty pounds because of his diabetes.  AR 23.  Swett is single and lives with his 19-year-old son.  AR 23.  Swett does not have a driver's license because of his blurred vision where he "can't see half of the time on [his] left side."  AR 24.

At the time of the hearing, he worked 20 to 25 hours per week as a dishwasher at Ford Dodge Community College.  AR 24.  As a dishwasher and fast-food worker he occasionally would have to lift up to fifty pounds.  AR 32.  Swett is a diabetic and injects insulin four times a day, which takes him 15 to 20 minutes to do.  AR 24-25, 27.  If his blood sugar level is still too high, he also takes Novolog as necessary to reduce his diabetes.  AR 26-27.  It takes Swett 15 minutes to check his blood sugar.  AR 28.

Swett's diabetes causes him to feel fatigued; "sometimes it takes up to two days at a time to recuperate." AR 28. As a result of his fatigue, he naps "[a]t least four times a day." AR 28. He also suffers from loss of muscle, strength, and vision, and has nerve pain throughout his legs and arms. AR 28. Swett also suffers from a loss of sensation, and has numbness in his hands and feet from nerve damage. AR 29. According to Swett, "sometimes where I'm walking . . . I'll get into a point where my leg just feels like it goes into a limp mode and I start limping, loss of strength, very painful sharp pains in the bottom of my feet." AR 29. The ALJ noted that Swett's medical records indicate that he never complained to a doctor about his hands and feet tingling, but Swett responded that the tingling began "[t]he moment that [he] developed diabetes." AR 31. Swett testified that he also suffers daily from blurry vision in both eyes, and is in pain on a daily basis. AR 28-30.

Swett's employer at the time of the hearing did not have a problem with his taking occasionally unscheduled breaks for insulin injections. AR 28-29. At times Swett would need to take unscheduled breaks because "[s]ometimes I just got to get up and go." AR 29.

**B.    *VE's Testimony***

The VE testified that a hypothetical individual of Swett's age, education, and work experience with diabetes, obesity, and a restriction on work requiring fine visual detail who could lift 50 pounds occasionally and frequently could perform Swett's past work as a dishwasher, fast-food worker, and stocker as generally performed, AR 32. Such an individual, however, would not be competitively employable if that individual also had to take two or more unscheduled fifteen-minute breaks per day, could not stand for more than a total of two hours during a work day, and could not perform gross or fine manipulation. AR 32-33.

According to the VE, an individual with no limitations other than the need for two unscheduled fifteen-minute breaks could be competitively employed. AR 33. On the other hand,

a work restriction of three or more unscheduled fifteen-minute breaks "would limit a person's employability."  AR 34.

### 3.   *Summary of the ALJ's decision*

On July 6, 2010, the ALJ found that Swett (1) had not engaged in substantial gainful activity since the alleged onset date of disability of April 15, 2006; and (2) had an impairment or a combination of impairments considered to be "severe" on the basis of the requirements in the Code of Federal Regulations; but (3) did not have an impairment or a combination of impairments meeting or equaling one of the impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1; and (4) was able to perform his past relevant work as a dishwasher, stocker, and fast-food worker.  AR 11-15.  The ALJ accordingly found that Swett was not disabled from April 15, 2006, through the date of the ALJ's decision.  AR 15.

In so finding, the ALJ found that the plaintiff had the RFC to perform medium work and lift 50 pounds occasionally and 50 pounds frequently, but he could not "perform fine detail in vision."  AR 12.

Regarding Swett's credibility, the ALJ found that his "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [his] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [ALJ's] residual functional capacity assessment."  AR 14.  The ALJ found that Swett "experiences some symptoms and limitations; however, the record does not fully support the severity of [his] allegations."  AR 14.  Swett "has received treatment for diabetes, yet the primary recommendation was for [him] to exhibit better self care and follow prescribed medication regimens.  Multiple cardiac tests proved negative.  [Swett] periodically received musculoskeletal pain care, but on an episodic basis only."  AR 14.  The ALJ noted Swett's "history of diabetes mellitus, with poor

14

> compliance with treatment.  Treatment notes from March 2008
> indicated [he] 'has not made any of the dietary nor lifestyle nor
> exercise changes based on recommendations from [the]
> diabetic educator.'"  AR 13 (quoting AR 296).  Further, the
> ALJ "fully incorporated" the effect of Swett's obesity into the
> ALJ's RFC assessment.  AR 13.

Report And Recommendation at 2-11 (docket no. 12).  I adopt Judge Zoss's findings of fact, as the parties have not objected to them.

## II.  ANALYSIS

### A.  Standard Of Review

The court reviews the magistrate judge's report and recommendation pursuant to the statutory standards found in 28 U.S.C. § 636(b)(1):

> A judge of the court shall make a *de novo* determination of
> those portions of the report or specified proposed findings or
> recommendations to which objection is made.  A judge of the
> court may accept, reject, or modify, in whole or in part, the
> findings or recommendations made by the magistrate judge.
> The judge may also receive further evidence or recommit the
> matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1) (2006); *see* Fed. R. Civ. P. 72(b) (stating identical requirements); N.D. Ia. L.R. 72, 72.1 (allowing the referral of dispositive matters to a magistrate judge but not articulating any standards to review the magistrate judge's report and recommendation).  While examining these statutory standards, the United States Supreme Court explained:

> Any party that desires plenary consideration by the Article III
> judge of any issue need only ask.  Moreover, while the statute
> does not require the judge to review an issue *de novo* if no
> objections are filed, it does not preclude further review by the

> district judge, *sua sponte* or at the request of a party, under a
> *de novo* or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 154 (1985).  Thus, a district court may review *de novo* any issue in a magistrate judge's report and recommendation at any time.  *Id.*  If a party files an objection to the magistrate judge's report and recommendation, however, the district court *must* "make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made."  28 U.S.C. § 636(b)(1).  In the absence of an objection, the district court is not required "to give any more consideration to the magistrate's report than the court considers appropriate."  *Thomas*, 474 U.S. at 150.

*De novo* review, of course, is nondeferential and generally allows a reviewing court to make an "independent review" of the entire matter.  *Salve Regina College v. Russell*, 499 U.S. 225, 238 (1991) (noting also that "[w]hen *de novo* review is compelled, no form of appellate deference is acceptable"); *see Doe v. Chao*, 540 U.S. 614, 620-19 (2004) (noting *de novo* review is "distinct from any form of deferential review").  The *de novo* review of a magistrate judge's report and recommendation, however, only means a district court "'give[s] fresh consideration to those issues to which specific objection has been made.'"  *United States v. Raddatz*, 447 U.S. 667, 675 (1980) (quoting H.R. Rep. No. 94-1609, at 3, *reprinted in* 1976 U.S.C.C.A.N. 6162, 6163 (discussing how certain amendments affect 28 U.S.C. § 636(b))).  Thus, while *de novo* review generally entails review of an entire matter, in the context of § 636 a district court's *required de novo* review is limited to "*de novo* determination[s]" of only "those portions" or "specified proposed findings" to which objections have been made.  28 U.S.C. § 636(b)(1); *see Thomas*, 474 U.S. at 154 ("Any party that desires plenary consideration by the Article III judge of any issue need only ask.").  Consequently, the Eighth Circuit Court of Appeals

16

has indicated *de novo* review would only be required if objections were "specific enough to trigger *de novo* review." *Branch v. Martin*, 886 F.2d 1043, 1046 (8th Cir. 1989). Despite this "specificity" requirement to trigger *de novo* review, the Eighth Circuit Court of Appeals has "emphasized the necessity . . . of retention by the district court of substantial control over the ultimate disposition of matters referred to a magistrate." *Belk v. Purkett*, 15 F.3d 803, 815 (8th Cir. 1994). As a result, the Eighth Circuit has been willing to "liberally construe[]" otherwise general pro se objections to require a *de novo* review of all "alleged errors," *see Hudson v. Gammon*, 46 F.3d 785, 786 (8th Cir. 1995), and to conclude that general objections require "full *de novo* review" if the record is concise. *Belk*, 15 F.3d at 815 ("Therefore, even had petitioner's objections lacked specificity, a *de novo* review would still have been appropriate given such a concise record."). Even if the reviewing court must construe objections liberally to require *de novo* review, it is clear to this court that there is a distinction between making an objection and making no objection at all. *See Coop. Fin. Assoc., Inc. v. Garst*, 917 F. Supp. 1356, 1373 (N.D. Iowa 1996) ("The court finds that the distinction between a flawed effort to bring objections to the district court's attention and no effort to make such objections is appropriate."). Therefore, I will strive to provide *de novo* review of all issues that might be addressed by any objection, whether general or specific, but will not feel compelled to give *de novo* review to matters to which no objection at all has been made.

In the absence of any objection, the Eighth Circuit Court of Appeals has indicated a district court should review a magistrate judge's report and recommendation under a clearly erroneous standard of review. *See Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting when no objections are filed and the time for filing objections has expired, "[the district court judge] would only have to review the findings of the magistrate judge for clear error"); *Taylor v. Farrier*, 910 F.2d 518, 520 (8th Cir. 1990) (noting the

17

advisory committee's note to Fed. R. Civ. P. 72(b) indicates "when no timely objection is filed the court need only satisfy itself that there is no clear error on the face of the record"); *Branch*, 886 F.2d at 1046 (contrasting *de novo* review with "clearly erroneous standard" of review, and recognizing *de novo* review was required because objections were filed). The United States Supreme Court has stated that the "foremost" principle under the "clearly erroneous" standard of review "is that '[a] finding is "clearly erroneous" when[,] although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). Thus, the clearly erroneous standard of review is deferential, *see Dixon v. Crete Medical Clinic, P.C.*, 498 F.3D 837, 847 (8th Cir. 2007) (noting a finding is not clearly erroneous even if another view is supported by the evidence), but a district court may still reject the magistrate judge's report and recommendation when the district court is "left with a definite and firm conviction that a mistake has been committed." *U.S. Gypsum Co.*, 333 U.S. at 395.

Even though some "lesser review" than *de novo* is not "positively require[d]" by statute, *Thomas*, 474 U.S. at 150, Eighth Circuit precedent leads me to believe that a clearly erroneous standard of review should generally be used as the baseline standard to review all findings in a magistrate judge's report and recommendation that are not objected to or when the parties fail to file any timely objections, *see Grinder*, 73 F.3d at 795; *Taylor*, 910 F.2d at 520; *Branch*, 886 F.2d at 1046; see also FED. R. CIV. P. 72(b) advisory committee's note ("When no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."). In the context of the review of a magistrate judge's report and recommendation, I believe one further caveat is necessary: a district court always remains

18

free to render its own decision under *de novo* review, regardless of whether it feels a mistake has been committed. *See Thomas*, 474 U.S. at 153-54. Thus, while a clearly erroneous standard of review is deferential and the minimum standard appropriate in this context, it is not mandatory, and I may choose to apply a less deferential standard.[2]

---

[2] The Eighth Circuit Court of Appeals, in the context of a dispositive matter originally referred to a magistrate judge, does not review a district court's decision in similar fashion. The Eighth Circuit Court of Appeals will either apply a clearly erroneous or plain error standard to review factual findings, depending on whether the appellant originally objected to the magistrate judge's report and recommendation. *See United States v. Brooks*, 285 F.3d 1102, 1105 (8th Cir. 2002) ("Ordinarily, we review a district court's factual findings for clear error . . . . Here, however, the record reflects that [the appellant] did not object to the magistrate's report and recommendation, and therefore we review the court's factual determinations for plain error." (citations omitted)); *United States v. Looking*, 156 F.3d 803, 809 (8th Cir. 1998) ("[W]here the defendant fails to file timely objections to the magistrate judge's report and recommendation, the factual conclusions underlying that defendant's appeal are reviewed for plain error."). The plain error standard of review is different than a clearly erroneous standard of review, *see United States v. Barth*, 424 F.3d 752, 764 (8th Cir. 2005) (explaining the four elements of plain error review), and ultimately the plain error standard appears to be discretionary, as the failure to file objections technically waives the appellant's right to appeal factual findings. *See Griffini v. Mitchell*, 31 F.3d 690, 692 (8th Cir. 1994) (stating an appellant who did not object to the magistrate judge's report and recommendation waives his or her right to appeal factual findings, but then choosing to "review[] the magistrate judge's findings of fact for plain error"). An appellant does not waive his or her right to appeal questions of law or mixed questions of law and fact by failing to object to the magistrate judge's report and recommendation. *United States v. Benshop*, 138 F.3d 1229, 1234 (8th Cir. 1998) ("The rule in this circuit is that a failure to object to a magistrate judge's report and recommendation will not result in a waiver of the right to appeal '"when the questions involved are questions of law or mixed questions of law and fact.'" (quoting *Francis v. Bowen*, 804 F.2d 103, 104 (8th Cir. 1986), in turn quoting *Nash v. Black*, 781 F.2d 665, 667 (8th Cir. 1986))). In addition, legal conclusions will be reviewed *de novo*, regardless of whether an appellant objected to a magistrate judge's report and recommendation. *See, e.g., United States v. Maxwell*, 498 F.3d 799, 801 n.2 (8th Cir. 2007) ("In cases like this
(continued...)

Here, Swett has objected to several of Judge Zoss's findings. Although I will review these findings *de novo*, and Judge Zoss's other findings for clear error, I review the Commissioner's decision to determine whether the correct legal standards were applied and "whether the Commissioner's findings are supported by substantial evidence in the record as a whole." *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007) (citing *Haggard v. Apfel*, 175 F.3d 591, 594 (8th Cir. 1999)). Under this deferential standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002); *see also Page*, 484 F.3d at 1042 ("Substantial evidence is relevant evidence which a reasonable mind would accept as adequate to support the Commissioner's conclusion." (quoting *Haggard*, 175 F.3d at 594)). "If, after review, [the court] find[s] it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the denial of benefits." *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) (quoting *Mapes v. Chater*, 82 F.3d 259, 262 (8th Cir. 1996)). Even if the court would have "'weighed the evidence differently,'" the Commissioner's decision will not be disturbed unless "it falls outside the available 'zone of choice.'" *Nicola v. Astrue*, 480 F.3d 885, 886 (8th Cir. 2007) (quoting *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006)).

---

[2](...continued)
one, 'where the defendant fails to file timely objections to the magistrate judge's report and recommendation, the factual conclusions underlying that defendant's appeal are reviewed for plain error.' We review the district court's legal conclusions *de novo*." (citation omitted)).

### B.  Swett's Objections

In his objections, Swett challenges Judge Zoss's finding, and subsequent recommendation, that there is substantial evidence in the record to support the ALJ's determination that Swett is capable of performing past relevant work as a dishwasher, stocker, and fast food worker.  Specifically, the ALJ found that Swett has the residual functional capacity (RFC) to perform medium work, such that he could lift fifty pounds occasionally and fifty pounds frequently, but that he cannot perform fine detail in vision. Swett objects to Judge Zoss's Report And Recommendation, arguing 1) the ALJ's credibility determination was flawed because he improperly considered Swett's noncompliance with medical treatment; 2) Judge Zoss erroneously characterized the ALJ's decision to discredit Swett's allegations of peripheral neuropathy, and the ALJ's credibility determination itself was flawed because the ALJ ignored portions of the medical record showing Swett's peripheral neuropathy; and 3) the ALJ's hypothetical questions to the vocational expert (VE) and his RFC assessment were erroneous, as they failed to account for Swett's peripheral neuropathy and need for breaks and used an improper lifting restriction.

### 1.    The ALJ's credibility determination

Swett maintains that the ALJ, in making his credibility determination, erroneously considered Swett's noncompliance with treatment and ignored evidence of Swett's peripheral neuropathy.  When evaluating a claimant's subjective complaints, an ALJ must employ the multi-factor standard articulated by the Eighth Circuit Court of Appeals in *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), which examines "the claimant's prior work history; daily activities; duration, frequency, and intensity of pain; dosage, effectiveness and side effects of medication; precipitating and aggravating factors; and functional restrictions." *Halverson v. Astrue*, 600 F.3d 922, 931 (8th Cir. 2010) (quoting

*Medhaug v. Astrue*, 578 F.3d 805, 816 (8th Cir. 2009), in turn citing *Polaski*, 739 F.2d at 1322). Nonetheless, "[t]he ALJ is not required to discuss each *Polaski* factor as long as 'he acknowledges and considers the factors before discounting a claimant's subjective complaints.'" *Id.* at 932 (quoting *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009)). Rather, "[t]he ALJ need only acknowledge and consider those factors before discounting a claimant's subjective complaints." *Eichelberger v. Barnhart*, 390 F.3d 584, 590 (8th Cir. 2004). The ALJ may also consider "the absence of objective medical evidence to support the complaints, although the ALJ may not discount a claimant's subjective complaints solely because they are unsupported by objective medical evidence." *Halverson*, 600 F.3d at 931-32 (citing *Mouser v. Astrue*, 545 F.3d 634, 638 (8th Cir. 2008)). Additionally, "acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility," *id.* at 932 (citing *Heino v. Astrue*, 578 F.3d 873, 881 (8th Cir. 2009)), and the ALJ may discredit "a claimant's subjective complaints if there are inconsistencies in the record as whole,'" *id.* (quoting *Van Vickle v. Astrue*, 539 F.3d 825, 828 (8th Cir. 2008)). Courts generally defer to an ALJ's credibility finding when the ALJ "'explicitly discredits the claimant's testimony and gives good reason for doing so.'" *Id.* at 932 (quoting *Juszczyk v. Astrue*, 542 F.3d 626, 632 (8th Cir. 2008)). The Eighth Circuit Court of Appeals has cautioned judges against "substitut[ing] [their] opinion for that of the ALJ, who is in a better position to assess credibility." *Eichelberger*, 390 F.3d at 590 (citing *Brown v. Chater*, 87 F.3d 963, 965 (8th Cir. 1996)).

### a. Compliance with treatment

Swett contends that the ALJ improperly discounted Swett's credibility on the basis of his noncompliance with prescribed diabetes treatment. Swett maintains that he made every effort to comply with prescribed treatment but that his diabetes nevertheless

remained out of control. The ALJ concluded, after considering the *Polaski* standard, that Swett's noncompliance with treatment, among other factors, weighed against Swett's credibility: "The claimant experiences some symptoms and limitations; however the record does not fully support the severity of the claimant's allegations. The claimant has received treatment for diabetes, yet the primary recommendation was for the claimant to exhibit better self care and follow prescribed treatment regimens." AR 14. The Eighth Circuit Court of Appeals has determined that a "claimant's failure to follow prescribed course of treatment weigh[s] against credibility when assessing subjective complaints of pain." *See Ramirez v. Barnhart*, 292 F.3d 576, 582 (8th Cir. 2002) ("Claimant . . . refus[ed] to see a dietician to lose the weight exacerbating her back pain, neglect[ed] to take prescribed medication, and fail[ed] to perform her prescribed physical therapy exercises.") (citing *Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001)); *accord Tellez v. Barnhart*, 403 F.3d 953, 957 (8th Cir. 2005) (approving ALJ's consideration of claimant's "medical non-compliance" in discounting the claimant's credibility). Swett attempts to distinguish his noncompliance from that in *Ramirez*, arguing,

> In *Ramirez* . . . the plaintiff complained of pain but did not seek treatment or take medication that would alleviate pain[,] thus eroding her credibility. Mr. Swett regularly goes to the doctor seeking changes to his diabetes treatment, he seeks education about his lifestyle by going to a diabetic educator, and he injects himself regularly. Yet, his blood sugar is regularly out of control. . . . His noncompliance is not the same as the noncompliant behavior seen in the *Ramirez* case, and does not erode Mr. Swett's credibility.

Swett's Objections at 1 (docket no. 13). Swett maintains, "In this case there is no fact that can be relied upon that suggests that [Swett's] noncompliance was intentional." *Id*.

The record contradicts Swett's assertions. There is substantial evidence throughout

the record that Swett failed to follow his physicians' prescribed treatment—and not due to an inability to comply.  Swett's physician reported in March 2008, "[H]e has not made any of the dietary nor lifestyle nor exercise changes based on recommendations from the diabetic educator," and, moreover, that he was "not currently interested in changing many of his lifestyle factors."  AR 296.  During that same visit, Swett's physician "urged [him] to strive for better compliance."  *Id*.  Earlier, in November 2004, Swett reported that he had not taken medicine for his diabetes or hypertension for a year.  AR 241.  In May 2005, his physician listed his medical history as "diabetes, hypertension, noncompliant."  AR 244.  On the other hand, there is at least some indication in the record that Swett did his best to comply with prescribed treatment, for instance, in July 2006: "Pt uses three different Glucometers to check BS's . . . including morning, midday, before work and at bedtime.  Attends diabetes education.  Pt states that he tries to make healthy dietary choices."  AR 309.  Additionally, there is some evidence that Swett, at times, could not afford his medications.  *See, e.g.,* AR 313.  Nonetheless, because substantial evidence shows that Swett failed to follow prescribed treatment, even when able to comply, I find that, to the extent the ALJ relied on Swett's noncompliance in discounting his credibility, such reliance was proper.  *See Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010) ("'[A court] may not reverse the Commissioner's decision merely because substantial evidence exists in the record that would have supported a contrary outcome.'" (quoting *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000))).

### b.    *Evidence of peripheral neuropathy*

Swett advances two objections regarding the ALJ's decision to discredit Swett's subjective allegations of peripheral neuropathy.  First, Swett asserts that Judge Zoss erroneously found that the ALJ specifically assessed the credibility of Swett's subjective allegations of peripheral neuropathy.  Swett maintains that the ALJ's credibility

determination did not refer to Swett's peripheral neuropathy.[3]   Second, Swett argues that the ALJ ignored medical evidence of peripheral neuropathy in the record and thus improperly discounted Swett's allegations of peripheral neuropathy.

I first address Swett's objection to Judge Zoss's characterization of the ALJ's decision.  With respect to the ALJ's consideration of Swett's peripheral neuropathy, Judge Zoss reasoned, as follows:

> The ALJ found that Swett "alleged neuropathy in his extremities; however, the medical evidence does not document such complaints."  AR 13.  Swett maintains that "[t]he ALJ erred in not finding that there was peripheral neuropathy."  Doc. No. 8 at 18.  The ALJ did not discount Swett's diagnosis of neuropathy.  Rather, the ALJ found Swett's allegations that his limitations from his neuropathy were disabling not to be credible.

Report And Recommendation at 20 (docket no. 12).  Swett asserts that Judge Zoss's explanation "does not correctly reflect the ALJ decision."  Swett's Objections at 2 (docket no. 13).  Swett contends that the ALJ's decision "discuss[ed] the *Polaski* standard but only applie[d] the facts relating to 'treatment for diabetes' and 'multiple cardiac tests.'  There

---

[3]  Swett's argument here is somewhat unclear, as he argued to Judge Zoss that, although the ALJ *did* assess the credibility of Swett's complaints of peripheral neuropathy, the assessment was flawed.  Swett asserted in his briefs to Judge Zoss, "The ALJ also points to the fact that Mr. Swett did not report any concerns about peripheral neuropathy. . . . The ALJ erred in making the credibility determination he did in reliance on this factor," (docket no. 8 at 30), and, "The plaintiff is not complaining that the ALJ did not address plaintiff's credibility—the plaintiff is asserting that the ALJ credibility determination is flawed," (docket no. 10 at 2).

Nonetheless, despite the fact that Swett's argument is unclear, I will consider both his objection to Judge Zoss's characterization of the ALJ's decision *and* his objection that the ALJ ignored evidence in the record of Swett's peripheral neuropathy and thus improperly discounted his subjective complaints.

is no discussion relative to a credibility finding as it relates to Mr. Swett's peripheral neuropathy." *Id.*

I find that Judge Zoss fairly characterized the ALJ's decision. The ALJ made the following findings regarding Swett's credibility following his explanation of the *Polaski* factors:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.
>
> The claimant experiences some symptoms and limitations; however, the record does not fully support the severity of the claimant's allegations. The claimant has received treatment for diabetes, yet the primary recommendation was for the claimant to exhibit better self care and following prescribed medication regimens. Multiple cardiac tests proved negative. The claimant periodically received musculoskeletal pain care, but on an episodic basis only.

AR 14. Swett is correct that the ALJ did not specifically mention "peripheral neuropathy" after his reference to the *Polaski* factors. However, before his discussion of the *Polaski* factors, the ALJ noted, "The claimant alleged neuropathy in his extremities; however, the medical evidence does not document such complaints. . . . Notably, the claimant does not take any prescription medications to relieve neuropathic pain. The claimant reported some heel pain in April 2008, but this was after walking 5-6 miles." AR 13. Swett appears to insist that merely because the ALJ did not reiterate these comments regarding Swett's peripheral neuropathy *after* discussing the *Polaski* factors, the ALJ did not assess the credibility of Swett's allegations of peripheral neuropathy. I find that Swett's mechanistic

26

interpretation is at odds with the deferential standard of review that courts afford ALJ decisions. *See Strongson v. Barnhart*, 361 F.3d 1066, 1072 (8th Cir. 2004) ("[A court] will not set aside an administrative finding based on an 'arguable deficiency in opinion-writing technique' when it is unlikely it affected the outcome." (quoting *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996))); *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010) (Courts should give an ALJ's decision "a commonsensical reading rather than nitpicking at it" (citation omitted)). Thus, taken in context, a fair reading of the ALJ's decision would be that the ALJ found that the "record does not fully support the severity of the claimant's allegations," AR 14, including Swett's allegations of peripheral neuropathy. Therefore, I agree with Judge Zoss's determination that "the ALJ found Swett's allegations that his limitations from his neuropathy were disabling not to be credible." Report And Recommendation at 20.

Beyond his objections to Judge Zoss's characterization of the ALJ's decision, Swett argues that the ALJ erred in discounting Swett's allegations of peripheral neuropathy. Swett contends that the record demonstrates that he sought and received treatment for peripheral neuropathy, and that even the state agency medical consultant diagnosed Swett with neuropathy and found that it limited Swett's ability to work. Swett adds that the ALJ improperly focused on the one instance in which Swett walked five to six miles as proof that he did not suffer from pain and numbness in his extremities. Swett argues that this "one time episode does not destroy [his] credibility concerning his normal walking." Swett's Objections at 2 (docket no. 13).

The ALJ's decision to discount Swett's subjective allegations of peripheral neuropathy was proper. In the administrative hearing, Swett testified that he experienced the following problems related to peripheral neuropathy, which began "[t]he moment that [he] developed diabetes," AR 31:

27

> [S]kin wear or loss of feeling in the bottom of the feet where
> if I walk there's a piece of glass on the floor and I walk over
> it where I won't be able to feel it so next thing I noticed where
> I got a cut on the bottom of the foot and sometimes it gets
> infected.
>
> . . . .
>
> Nerve damage, just very numb in the hands, feet, sometimes
> where I'm walking I'll lose - - I'll get into a point where my
> leg just feels like it goes into a limp mode and I start limping,
> loss of strength, very painful sharp pains in the bottom of my
> feet.

AR 29.  The ALJ, however, did not find these complaints of peripheral neuropathy to be credible and articulated his reasoning as follows: "The claimant alleged neuropathy in his extremities; however, the medical evidence does not document such complaints. . . . Notably, the claimant does not take any prescription medications to relieve neuropathic pain.  The claimant reported some heel pain in April 2008, but this was after walking 5-6 miles."  AR 13.  The ALJ's articulated grounds for discrediting Swett's allegations were proper.  An ALJ may discount a claimant's credibility based on "acts which are inconsistent with a claimant's assertion of disability."  *See Halverson*, 600 F.3d at 932. Here, walking five to six miles was inconsistent with Swett's allegations of very painful neuropathy in his legs and feet.  Additionally, "the absence of objective medical evidence to support the complaints" may weigh against a claimant's credibility, "although the ALJ may not discount a claimant's subjective complaints solely because they are unsupported by objective medical evidence.  *Id*. at 931-32.  Thus, it was appropriate for the ALJ to consider, as one factor in discounting Swett's subjective complaints, the lack of medical documentation to support the extent of his alleged limitations arising from peripheral neuropathy.

Swett argues that the ALJ "misse[d] the record" regarding his peripheral neuropathy. Swett's Objections at 2 (docket no. 13). He is certainly correct that there is some evidence of medical treatment for peripheral neuropathy in the record. Nonetheless, substantial evidence supports the ALJ's decision to discount Swett's subjective complaints. To begin, the medical record simply does not support the extent of burning, numbness, and pain that Swett alleges are caused by his peripheral neuropathy. The strongest evidence of his peripheral neuropathy comes from his doctor's notes on November 8, 2007, where Swett complained of

> bilateral foot pain located over medical [*sic*, medial] aspect of his ankles and medial aspect of each foot. He states this is mostly painful with weightbearing and gets worse throughout the day. He denies trauma to the area. Pt also has burning pain on the plantar aspect of the Lft foot over the metatarsal heads. He states this is only at night and is not associated with weight bearing. Pt also believes he has some numbness in that area. . . . There is minimal decreased sensation of the ball/plantar surface of the left foot.

AR 301-02. During that visit, Swett was prescribed Neurontin, 100 mg, for peripheral neuropathy.[4] AR 302. However, as indicated above, the doctor in that visit noted that Swett experienced only "minimal decreased sensation." *Id*. On July 12, 2006, Swett reported "left leg 'foot zingers' which just come on and off more in the last couple of weeks and only last for a few seconds [and] some numbness and stiffness in that leg which is worse than his right," AR 311, but Swett's doctor commented that she was "[n]ot sure if this is a valid thing or not." AR 312. On April 28, 2006, Swett reported "numbness,

---

[4] It is not clear from the medical records whether Swett's doctor diagnosed solely the burning and numbness on Swett's left foot as peripheral neuropathy or whether Swett's doctor diagnosed both the left foot burning and numbness and the bilateral foot pain as peripheral neuropathy. AR 301-02.

tingling and pain in his left arm and a shooting pain in his left leg." AR 322. Swett's doctor commented, "Perhaps some of this can be due to neuropathy secondary to diabetes but it does not seem typical in nature." AR 323. On January 20, 2006, Swett complained of "left leg shooting pains," which the doctor diagnosed as "probably MSK pain and neuropathy." AR 333. Swett was prescribed a topical Capsaicin cream for pain. AR 333. Swett is correct that the state agency medical consultant diagnosed Swett with diabetic neuropathy. AR 372. However, Swett overstates the resulting limitations found by the medical consultant, who determined only that "[d]ue to diabetic neuropathy [Swett's] ability to tolerate extreme temperatures and hazards is mildly limited."[5] AR 376.

Moreover, beyond failing to support the extent of Swett's alleged limitations arising from peripheral neuropathy, the record contains evidence that is inconsistent with his subjective complaints. In a Personal Pain/Fatigue Questionnaire dated March 15, 2009, Swett answered "no" in response to the questions, "Does your pain/fatigue limit your ability to use your arms or hands?" and "Does your pain/fatigue limit your ability to walk and stand or sit?" AR 194-95. Swett alleged that he suffered from "skin wear" on the bottom of his feet, AR 29, but the state agency medical consultant, in discussing Swett's neuropathy, remarked that Swett "has no foot ulcerations or breakdown." AR 376. Furthermore, Swett argues that the ALJ unfairly focused on a "one-time" event in which Swett walked five to six miles as proof that Swett did not suffer from limitations due to peripheral neuropathy. However, the April 4, 2008, incident in which Swett walked five to six miles, AR 293, was not isolated. On November 26, 2007, Swett reported to his

---

[5] I also note that Swett has not explained how a "mildly limited" "ability to tolerate extreme temperatures and hazards" prevents him from performing his past relevant work as a dishwasher, stocker, and fast-food worker, all of which the ALJ found him able to do.

doctor that he "'walks a lot' around the house, at the supermarket, and six blocks with his son." AR 299. On February 19, 2009, Swett told his doctor that he walks every day. AR 403.

Therefore, because substantial evidence in the record as a whole supports the ALJ's decision to discount Swett's subjective complaints of limitations arising from his peripheral neuropathy, I find that the ALJ's credibility determination was proper. *See Page*, 484 F.3d at 1042. I will not "substitute [my] opinion for that of the ALJ, who is in a better position to assess credibility." *Eichelberger*, 390 F.3d at 590.

### 2.      *Residual functional capacity assessment and hypothetical questions*

Swett argues that the ALJ, in determining Swett's RFC and in posing hypothetical questions to the VE, erred by 1) failing to incorporate limitations caused by peripheral neuropathy 2) failing to incorporate Swett's need for breaks and 3) using an improper lifting restriction.

In formulating a claimant's RFC and in posing hypothetical questions to the VE, the ALJ need only include the claimant's limitations and impairments that he has determined to be credible. *See Dukes v. Barnhart*, 436 F.3d 923, 928 (8th Cir. 2006) ("Before the ALJ could determine [the claimant's] RFC, he first had to assess [the claimant's] credibility as to his subjective complaints. . . . A hypothetical question posed to a VE need only include those impairments and limitations found credible by the ALJ." (citation and internal quotation marks omitted)); *see also Heino*, 578 F.3d at 882; *Tellez*, 403 F.3d at 957 ("[T]he ALJ's determination regarding [the claimant's] RFC was influenced by his determination that her allegations were 'less than fully credible,' and we give the ALJ deference in that determination."). As with other aspects of an ALJ's decision, a reviewing court must look to see whether the ALJ's RFC and hypothetical questions were "supported by substantial evidence in the record as a whole." *See Page*, 484 F.3d at 1042;

31

*Morse v. Shalala*, 32 F.3d 1228, 1230 (8th Cir. 1994) (per curiam) ("In order for an ALJ to rely on a vocational expert's opinion, the posed hypothetical must accurately describe a claimant's impairments.  The proper question for a court in reviewing such a finding by an ALJ is whether the information given to the vocational expert in the hypothetical was supported by substantial evidence in the record as a whole." (citation omitted)).  Furthermore, "an ALJ may omit alleged impairments from a hypothetical question when the record does not support the claimant's contention that his impairments significantly restricted his ability to perform gainful employment." *Owen v. Astrue*, 551 F.3d 792, 802 (8th Cir. 2008) (citation and internal quotation marks omitted).

### a.    *Peripheral neuropathy and need for breaks*

Here, the ALJ did not err in excluding Swett's alleged limitations due to peripheral neuropathy from the RFC and the hypothetical questions to the VE.  As discussed above, the ALJ properly discounted Swett's subjective complaints related to peripheral neuropathy and, thus, did not need to include them in the RFC and the hypothetical questions.  *See Dukes*, 436 F.3d at 928.

Swett also asserts that the ALJ erred by failing to include in the RFC and hypothetical questions Swett's need for scheduled and unscheduled breaks throughout the workday to monitor his blood sugar and inject insulin.  Swett maintains that his testimony about his need for such breaks was credible, as there was no contradictory evidence in the record and, moreover, the medical evidence documented that he regularly takes insulin.  Swett testified that he takes his Atlantis insulin four times a day, at 8 a.m., noon, 4 p.m., and before bed.  AR 25-26.  He also testified that, in addition to the Atlantis, he takes his NovoLog insulin "if [his] sugar level is still too high.  It's normally based on before I eat and after I eat," and that he knows he needs his NovoLog if he feels "[l]ight headed, dizziness, shaky."  AR  26.  Swett stated that he takes the NovoLog every day, between

four to eight times per day.  AR 26-27.  He also tests his blood sugar everyday.  AR 27.
Swett testified that it takes "roughly 15 to 20 minutes" to inject himself with insulin and
"another 15 minutes at least" to test his blood sugar.  AR 27-28.  The ALJ asked Swett
how he injects insulin at his current job as a dishwasher, where he works 20-25 hours per
week, AR 24:

> Q: Okay I kind of want to jump back a little bit and talk about
> your - - the job that you're at.  I assume you have to go to the
> bathroom a lot due to the insulin injection.
> A: Yes I do.
> Q: Does [*sic*] your employer aware of this?  Do they give you
> any problems with that?
> A: They are aware but they don't give me any problems at all
> [*sic*] of taking breaks when I need to.
> Q: Okay and are your breaks pretty scheduled or do you
> sometimes just have to get up and go and take a break?
> A: Sometimes I just got to get up and go.

 AR 28-29.

　　　　The ALJ did not err in excluding, from the RFC and hypothetical questions, Swett's
need for breaks due to his insulin injections and blood sugar testing, as an ALJ need not
include "alleged impairments . . . when the record does not support the claimant's
contention that his impairments significantly restricted his ability to perform gainful
employment."  *See Owen*, 551 F.3d at 802.  During the hearing, Swett's attorney asked
the VE how many unscheduled breaks would be permitted by an employer:

> Q: Okay do you know normally what - - how many
> unscheduled breaks of 15 minute duration would be tolerated
> by an employer?
> A: That's a - - there's no set rule.  In my professional opinion,
> it would depend on the job that you're talking about and the
> situation essentially as a general rule, I think you know more
> than two would not be tolerated.

AR 33.  Based on the VE's testimony, although "there's no set rule," it appears that two unscheduled breaks of fifteen minute duration would not interfere with Swett's employment.   There is no indication in the record that Swett requires more than two unscheduled breaks during the work day.  He testified that he "sometimes" needs "to get up and go," but he did not testify that he needs to do so more than twice in a work day. Although Swett testified that he uses his NovoLog as needed, approximately four to eight times a day, he also stated that he generally used it "before I eat and after I eat," AR 26. Thus, there is no indication that he would need more than two unscheduled breaks to use it outside of scheduled eating times.   Moreover, Swett testified that his current employer is aware that he needs to take breaks and that "they don't give [him] any problems at all [about] taking breaks when [he] need[s] to."  AR  28.   Although Swett is not working full time at his current job as a dishwasher, but rather 20-25 hours per week, the fact that his current employer has no problem with his scheduled and unscheduled breaks is further evidence that his breaks do not interfere with his ability to work.  *See Dukes*, 436 F.3d at 928 ("The fact that [the claimant] was employed at the time of the hearing in a field of work identified by the VE, laundry laborer, supports the determination that [the claimant] failed to meet his burden of establishing that he could not engage in past relevant work."). Therefore, while the ALJ did not incorporate Swett's need for breaks into his final decision, both the VE's testimony in response to questions from Swett's attorney and Swett's own employment demonstrate that his need for breaks does not "significantly restrict[] his ability to perform gainful employment."  *See Owen*, 551 F.3d at 802.  Thus, the ALJ did not err in omitting Swett's need for breaks.

### b.    Lifting restriction

Swett also maintains that the ALJ employed an improper lifting restriction when formulating his RFC and his hypothetical questions.  The ALJ found, in his assessment of Swett's RFC, that Swett "could lift fifty pounds occasionally and fifty pounds frequently." AR 12.  Swett notes that both state agency medical consultants determined that Swett could lift fifty pounds occasionally and only *twenty-five* pounds frequently, not fifty.  AR 373, 410.  Consequently, Swett argues that, [w]hen the ALJ substituted the heavier restriction for his RFC he did so with no support from the medical record.  An ALJ may not substitute his or her opinion for that of qualified professionals."  Swett's Objections at 3 (docket no. 13).  Swett therefore concludes that both the RFC and the hypothetical questions posed to the VE were erroneous.

Even conceding Swett's argument that the ALJ erred in finding that Swett could lift fifty pounds frequently, Swett has not shown how this error repudiates the ALJ's finding that Swett could perform his past relevant work as a dishwasher, fast food worker, and stocker.  AR 15.  "[T]he claimant bears the burden to establish that he or she cannot return to past relevant work."  *Dukes*, 436 F.3d at 928 (quoting *Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005)).  Swett does not contest the state agency medical consultants' findings that he could lift fifty pounds occasionally and twenty-five pounds frequently—indeed, he argues that the ALJ erred by failing to follow the medical consultants' lifting restrictions.  Swett's Objections at 3 (docket no. 13).  Swett's ability to lift twenty-five pounds frequently and fifty pounds occasionally qualifies him for "medium work," as defined by the SSA regulations: "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can also do sedentary and light work."  20 C.F.R. § 416.967(c).  Swett's past relevant work requires

medium or light exertion: his work as a dishwasher and a stocker was medium work, and his work as a fast food worker was light. AR 15. Therefore, even accepting that the ALJ erred in finding Swett was capable of lifting fifty pounds frequently, Swett, who is able to lift fifty pounds occasionally and twenty-five pounds frequently, remains able to perform his past relevant work. Thus, the ALJ's finding that Swett was not disabled because he was able to perform his past relevant work is supported by substantial evidence in the record as a whole.

### III.  CONCLUSION

THEREFORE, I find that the ALJ's determination that Swett is capable of performing his past relevant work as a fast food worker, stocker, and dishwasher is supported by substantial evidence in the record as a whole.  Judge Zoss recommended that the ALJ's decision be affirmed and that judgment be entered in favor of the Commissioner and against Swett.  I agree and thus **accept** Judge Zoss's Report And Recommendation (docket no. 12).

**IT IS SO ORDERED.**

**DATED** this 5th day of December, 2011.

MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA